Good morning. Lawrence Padway for Patricia Broyles. And I'd like to reserve half of my time for rebuttal, if I might. All right. The trial court at page 12 of its opinion reports that Dr. Pfeffer's statements were unclear and open to conflicting interpretation. The trial court says essentially the same thing on page 3, and certainly that's what we've said in our briefs. And I think it's apparent to anybody who looks at the attending physician statement. The question is, what does a fiduciary do with conflicting or not – with a statement that's open to conflicting interpretation and is unclear? And the law is – Let me just ask about that. Didn't Dr. Pfeffer state unequivocally on the APS form that your client was capable of returning immediately to a full-time sedentary position? No. And would you explain why not, please? Okay. The question – and it's in the excerpts from the record at page 332. It's also on page 5 of our reply brief. The question is, what reasonable or job site modifications could the employer make to assist the individual to return to work? Please specify. The answer is sedentary work. There's nothing in this question that indicates that that is intended to mean she can return to work now. And if you – particularly if you look up the page under 3, assessment – you know, actually, a date you recommended patients should stop working. The answer is yes. Why foot pain? A planned course of treatment, she has had surgery and may need further surgery. So it's a very confusing form. If you look at prognosis, when – in section 5 – when do you anticipate the patient can return to work? Question mark. Yeah. Yeah. So that – it appears to be contradictory, what kind of work, but it appears to be uncertain. As to when and at what time, if ever, she could return. Is that your argument? This is a – you know, this is not a form that would get a good grade in any English class that I ever took. But he's a surgeon. He's not – he may not be very good at filling out forms. He's a grammarian. But the law in this circuit is clear. It goes back to Koonin, is that, you know, if you don't have the information that you need, if you don't have clear information, if you're missing an X-ray that would be helpful or whatever, you go get it. They didn't. And even if you were to say, okay, we're going to interpret it this way, then when he sends a letter in later on that says, no, what I said was she can't work, period, I don't care what kind of job, and he does clarify that during the appeal period, and then they say, well, that contradicts what you said here. Well, the man did not do a very good job filling out the form. Then it says, how long will these limitations persist? He left that one blank. So one question I have, though, is they did have a bit of back and forth here. And when it was denied, they said it says the denial invited her to submit medical documentation that supports the view that her limitations and restrictions left her unable to perform sedentary work. So at that point, was it incumbent on her to submit something more? And they did. And they submitted a letter from him which said, my opinion, she can't work. She's been unable to work at any job since September 15, 2005, sedentary or otherwise. And the insurer looks at that and they say, well, that contradicts what you said earlier. Well, it doesn't really. I mean, what he said the first time is a mess. And he clarified it. And this is, you know, this is a problem that comes up time and time again in these ERISA cases. They say, well, you ask a layperson, you say, well, send me some medical documentation that supports your limitations. To most people, that means I need a note from the doctor saying take off work. It doesn't mean to go through the kind of detailed explanation that they really want. They never ask for it. I mean, you can look at the cases out of this circuit, Safon, Booten. You can go back as many years as you want. The insurance companies always have some boilerplate statement that doesn't really tell anybody what it is they need to submit. Give us medical records. What are they looking for? I mean, this is a case basically where the disability is based on swelling, pain, and a surgery that didn't work too well. You know? Well, here Dr. Pfeiffer said, I will be happy to explain the opinion if you wish me to. But they never called him. Is that correct? That's right. And that's basically the problem, is when you get something that is incomplete or unclear, what a fiduciary does is gets it clarified. Lots of ways to do it. They can call Dr. Pfeiffer. They can send him a note. They can have an independent medical examination done. There are lots of ways they can get this clarified. They chose not to clarify it. You know, usually the insurance companies, when they do their medical, have their medical consultants do the reports, most of the time they send that to the treating physician for comment. It's a very helpful thing. They're not required to do that under the regulations. But, you know, I would think if you're really interested in finding out what's fair and true, and you have two different opinions, why not send your consulting opinions to the treating physician? Do you want to save the remaining? You wanted half your time, so you're just about there. Yes. Okay. I did want to mention one other thing, which is with respect to footnote 5 in the order, which is where the trial court says, well, I'm not going to consider Dr. Pfeiffer's declaration, because in the denial letter of February 7th, this is the date, kind of the second denial letter, first appeal, they did say that they had this problem not understanding why she couldn't do a sedentary job. And that denial letter is on page 98 in the excerpts. And that's not an ERISA appeal denial letter, because it does not say you can submit further information. It says, this is denial. We have not, they have not gone to a new doctor, as they're required to on appeal. They went back to the same doctor. They said, but, you know, they don't say, here's what you need to do to perfect your claim. They don't say you're entitled to a copy of the file. They don't say you can submit more information. What they do is they say, okay, we're denying your appeal. Now it's going to the ARU unit for a review. So the only denial letter to which Mrs. Broyles can respond is the first denial letter of March 6th, I'm sorry, March 28th, 2006, which is at page 102 of the record. And that just says, well, you know, give us some medical documentation for your restrictions and limitations. So she never had the opportunity to respond to these statements, which are very good questions, very important, where they, consulting doctors are saying, we don't understand why you can't do a job sitting down. And Mrs. Broyles did explain that, which she does on page 222 to 224, when she was talking to the claims adjuster, and she said, when I sit down, my leg swells up, which is the same thing that Dr. Pfeiffer says in his declaration. But that information didn't go to any of the consulting doctors, because the consulting doctors only looked at the medical records. They didn't look at Mrs. Broyles' comments. So even though it's in the record that the problem she has working is that when she sits down, her leg swells up, she has a lot of pain, and she has to elevate her leg all day, which is also what Dr. Pfeiffer says later in his declaration, it didn't make it to the medical consultants, so it was never addressed. Well, he said Dr. Pfeiffer recommended Neuro, Neuro, Neurontin. Neurontin? Yes. Neurontin is a, it's a drug for nerve pain. Well, it says in the first denial letter that that's what he recommended, which would indicate that she'd be okay if she took the drug. No, because by the time of the first denial letter, they had Dr. Pfeiffer's note of January 20, 2006, in which he says, I think she needs further surgery. She's got some, she has some collapse of her foot, and she's going to need some further surgery. So that's not really a very good outcome. And then, of course, she goes on to have two knee replacements and then has her ankle redone. So she has, you know, quite a series of surgeries. Thank you. Thank you. Do you want to reserve the rest? Thank you. Just about three minutes left. May it please the Court. Matt Silvera for the appellees. The primary issue on this appeal is whether Standard abused its discretion by concluding that Ms. Broyles was not disabled from her sedentary occupation by reason of her foot condition. Now, Ms. Broyles' counsel in both the briefs and in his argument here today has focused almost exclusively on Dr. Pfeiffer's December 2005 attending physician statement and his contrary letter in November of 2006. What that fails to take into account is that Standard is not required to defer to the treating physician. It also ignores all of the rest of the evidence on the record that goes to whether Ms. Broyles was in fact disabled from her sedentary occupation. Now, if we look from the time that Ms. Broyles claimed that she was disabled, which is beginning on September 15th, after she ceased work on September 14th, she went to her physician at that time, Dr. Pfeiffer. Dr. Pfeiffer noted that she had not done any physical therapy at that point. He noted that there was a slight foot collapse, but that her condition was better than her preoperative condition. And he put her on Neurontin, which is, as Mr. Padaway noted, a neuropathic pain reliever. The only other appointment that we see with Dr. Pfeiffer during the coverage period is in October, October 18. At that time, Dr. Pfeiffer notes that she's doing well. He advises her to wean off of Neurontin and says to take nonsteroidal anti-inflammatory drugs, in this case naprosyn, which is a prescription strain to leave, essentially. What else do we have in the record is when she starts physical therapy, the physical therapist notes that she is not using the pain management tools that both the physical therapist and her doctor had recommended that she use. That includes orthotics, crutches, things of that nature. There's a note in the physical therapy records stating that she can work at a desk. When she is discharged from physical therapy on October 17 on her doctor's recommendation, her doctor who then told her to join a gym, the physical therapist noted that she was able to sustain up to 45 minutes of cardiovascular exercise, and once again noted that she was not consistently using pain management tools. We have no further records during the coverage period, which is September 15 to roughly December 15. The next thing we see on the record is in January 20, 2006, which is after the coverage period. At that point, she goes to see Dr. Pfeiffer. Dr. Pfeiffer notes that she does not have a nerve injury, that she does note intermittent burning, and suggests physical therapy for desensitization, and says that surgery may be an option if physical therapy does not work. In physical therapy, on January 30, the physical therapist notes for compliance once again. On February 3, he notes that she wears flip-flops rather than proper footwear or orthotics when she goes and notes very poor compliance. So if you look at all of the evidence on the record, as opposed to simply the November 2006 letter from Dr. Pfeiffer and the December 2005 attending physician statement, you'll see that that record is replete with evidence supporting standards determination. Well, let me just ask, the Dr. Pfeiffer offered to give his opinion when he did say that she felt she could no longer work or she could not work at that time, and there was no follow-up. No one called him. Right. There is nothing in the evidence showing that anyone called him. But the fact remains that Standard did work with Ms. Broyles and her counsel. Ms. Broyles did retain counsel after the initial denial, and Standard worked diligently with them to make sure that all evidence was submitted. She knew from the first denial letter and her counsel knew that, you know, that Standard believed that Dr. Pfeiffer's position was that she was capable of sedentary work. She took it upon herself and her counsel took it upon herself to submit a letter from Dr. Pfeiffer, which they said would clarify that position. So it is not as if Standard did not make efforts to get this information from Dr. Pfeiffer. But made no effort to get the explanation of Dr. Pfeiffer when they had said, we think you can do sedentary work. And now he says, oh, no, I didn't mean that when I filled out the form. When I could go back to work, he put a question mark. No one asked him for his explanation at what appeared to be conflicting statements. Right. Dr. Pfeiffer's conflicting statements. And so in light of this sort of contradiction in Dr. Pfeiffer's own statements Or purported inconsistencies. Purported inconsistencies, reasonable interpretation that there were inconsistencies. In light of that, they looked at all of the contemporaneous medical records. They looked at Dr. Pfeiffer's statements and notes during the period at issue. And that is ultimately what's important. The fact is the administrative review process is there for these sorts of disputes and for the claimant to go ahead and submit the information that supports the opinion. And as I said, her and her counsel said, we will obtain the evidence from Dr. Pfeiffer that would, if necessary, clarify that APS. They did so and all they got was the most conclusory of statements. In which he said, call me if you want me to explain my statement. Right. And as I said, what they did do is they reviewed all of the evidence. And so, you know, there is no arisen duty to call when a doctor says call. Especially when, you know, it is consistent with the plan that the claimant has to provide proof of disability. And the plan did repeatedly check with Ms. Broyles and her counsel for all such information that would support that claim. I thought there was a duty they had to follow up on anything that might help resolve the case. Well, they have a duty if they have questions or they think there are other information that is necessary. Where this comes from is in Booton, the Ninth Street case from 1997, when Judge Kaczynski noted that the physician consultants in that case had said, oh, well, we need x-rays here. We need more records here that are missing. And in that case, there was a need for the plan to say, okay, our physician consultants have requested these things. You have to go and seek that information when you know you need it. Here, Standard looked at the record that would have supported the contemporaneous record that would have supported Dr. Pfeiffer's position and evaluated that accordingly. But the agency seemed to take – pay no attention to his second letter. No, she cannot work. Well, no. In Dr. Manderkin's physician – Dr. Manderberg's physician consultant memo, he specifically considered that letter and said, look, there is nothing in the record that would support the statement that she was disabled from a sedentary occupation during the coverage period. So it's not as if Standard did not pay any heed to that letter. It, in fact, did consider it and concluded that the reliable medical evidence did not support that opinion. That is completely – But Dr. Waldron, we don't know if he saw it or not, because he seems to refer only to the first form. In his memo, he does not directly note it, but he does – in fact, it was given to him, and that is stated in the referral to him as well as in the denial letter. In any event, Dr. Manderberg was the final reviewing physician. And he did see the second letter. He did. There is absolutely a notation. And his view on – from his letter was the record doesn't support that conclusion. That's correct. That's right. That's right. If I could return. Now, another thing that's worth noting here is, you know, obviously just – December – well, December 8th is when the coverage period runs through. December 15th is another date that could be used because of the fact that there is a 90-day benefit waiting period. So it's immaterial here. There's no evidence that's contemporaneous with that period. Thank you. You're welcome. So, you know, what we do have here, apart from all this evidence, is the fact that, you know, Standard did engage in an ongoing good-faith dialogue, which is precisely what is required by the Ninth Circuit – by the Ninth Circuit case law. It considered all of the evidence that was supplied to it. Standard appropriately weighed evidence bearing on Standard's structural conflict of interest and concluded that Standard's exercise of discretion should be reviewed with a moderate level of skepticism. Well, forgive me, but I want to continue to pursue this idea that there was heavy reliance on Dr. Pfeiffer's form with the question mark and so forth. And isn't this analogous to the Montour case where the plant administrator's misinterpretation and over-reliance on one piece of evidence to the exclusion of others among other factors would constitute an abuse of discretion in this case? To the contrary. I think what we see is in the initial denial letter, Standard notes the APS letter and notes the rest of the record evidence. In the second denial letter, Standard looks at all of the objective evidence that I just stepped through in terms of all of Dr. Pfeiffer's records from that period and also notes that the one comment which has never truly been rebutted from the APS that said that what reasonable job or work site modifications would assist the employee's return to work answers sedentary work. It just noted that was consistent with what was in the record in terms of the contemporaneous medical records. And then it went on to look at the other evidence. It went on to look at the physical therapy records. So it's not as if this entire case is about the 2005 APS. Standard reviewed all of the evidence, and that's clear from its lengthy letters in which it explained its determinations, both in March of 2006 and March of 2007. Another point here, Mr. Padway made reference to the fact that the district court excluded evidence of Dr. Pfeiffer's declaration, which he submitted after this entire review process was over in connection with the district court litigation. Now, under Abadie, it's clear that courts have discretion to consider evidence that would bear on abuse of discretion, but they have to consider the ultimate decision on the merits. Now, here, Dr. Pfeiffer's declaration, after he had had multiple opportunities to submit his opinion, by no means was that an abuse of discretion. The district court also struck evidence of the Social Security Administration determination. That was absolutely proper as well, because the Social Security Administration determination had not even been handed down at the time that Standard made its final decision in March 2007, because one, a court is only allowed to take note of information if it bears on the conflict of interest or on the abuse of discretion. It could not take into account the Social Security Administration determination. Finally, Broyles and Ms. Broyles argued that there was some sort of abuse of discretion by not holding a bench trial with live testimony. That just completely sort of misreads Nolan. It's clearly not required in these claims that a court hold a bench trial with live testimony. That's even in the case of de novo cases. And moreover, Ms. Broyles did not submit any evidence that would have gone to the abuse of discretion or bias, which was the case in Nolan. So if the Court has no further questions, I'd just like to conclude by reiterating that it is not an abuse of discretion on the record here for Standard to have concluded that a person with a foot injury was not disabled from her sedentary occupation during the coverage period. Thank you. Thank you. I think it's extremely important to emphasize that Mrs. Broyles only had one denial  in the record, actually three, but the only one where they sent her a letter and said you can send in more information is the first one. So the second denial letter where they say we don't understand why you can't do a sedentary job, which is a very good question, they do not give her an opportunity to submit more information. They don't have any of the language from the Department of Labor Regulations in 29 CFR 2560.503-1 to allow her to respond or submit more things. They say we've denied this. Now we're going to go do this review. And that's a very important point. The policy argument was it was her duty to submit any additional information after the first denial letter. Yes, and it is, but that is a duty to respond to what they told her they needed. And what they told her that they needed wasn't an explanation of why you can't do a sit-down job. What they told her they needed was medical documentation that reports your restrictions and limitations from sedentary work, which could mean almost anything. They didn't focus. Well, they have to. I mean, that's basically saying tell us why you can't do sedentary work. Isn't that what that says in sort of English? Well, yes. But what they're looking at is a statement that says we understand why she can't do a sedentary job, why she can't walk around and stuff, but we don't understand why she can't work sitting down. And that's a good question. And they refer to Dr. Pfeiffer's letter in that denial, do they not? Well, in which denial? In the first denial. The one on March 28, 2006. And you're saying she had no opportunity to respond. She had an opportunity to respond to that letter. But that letter doesn't distinguish between walking around work, sedentary work, meaning light work, and sitting down work. That distinction is only made in the second denial, and she has no opportunity to add information or respond to that. But in the first denial, and going back to Dr. Mandeberg. Right. He basically puts out there the very same thing that your declaration would put in in the district court. He basically has his letter, says, look, what I mean is I don't think she can work, you know, she might not be able to go back to work, and at least not until 2007. That's what he says in his letter. And then they say, well, we read that letter. And then they go on to say, but then we looked at the medical records, and here's our conclusion. Right. The problem is, is that what they asked for was, they said, tell us what the restrictions and limitations are. Right. Medical documentation, that supports restrictions and limitations. It doesn't say explain why. Well. But that seems to be kind of pretty thin in terms of, I mean, you know. I'll tell you what. She says, so now you're trying to come off on sort of there's a technicality. Well, she really didn't know what she was supposed to tell them. Well, and she didn't. And the reason is that they never sent her the claim file. The first thing an ERISA attorney does in these cases is you say, send me the claim file. And the sentence that says you can look at the claim file is missing from the March 6th letter. That's supposed to be in there by regulation under 29 CFR 2560.503-1. It's like G or H. It says you're supposed to tell people you can look at the file. We'll send you the relevant material. So she got an attorney who. Okay. Well, now we've extended your time. Do you want to wrap up, please? All right. Thank you. Where did anybody respond or consider her statement that at 222 to 224 of the record, that when she sits down, she has profuse swelling of the entire leg, and it's painful. There is no doctor who looked at that for the plan. There's no doctor who considered it or talked about it. And if they're not going to call Dr. Pfeffer, the least they can do is listen to what she has to say. Thank you. I'll thank both of you for your argument this morning, and the case just argued is submitted, and we'll adjourn for the morning. Thank you. Your time has expired. Thank you. We've given you plenty of extra time this morning. I thank you, Your Honor. Yes, thank you. All rise. This court will decide to adjourn.
judges: Nelson D. W., Thompson, McKeown